Good morning. Amy Cleary on behalf of Appellant Joseph Felix. I'd like to try and reserve three minutes for my rebuttal. I'll keep track of my time. All right. This is a consolidated appeal of Mr. Felix's conviction for possession of a firearm. The consolidated appeal also involves his appeal of denial of motion for new trial. I'd like to briefly address two issues that the parties do agree on. The parties do agree that Mr. Felix's sentence should be remanded for Johnson because the district court sentenced him as an armed career criminal. The parties do agree also that if this court finds that the district court erroneously applied the Batson component regarding the first step of Batson, which requires that the defendant show a prima facie — make a prima facie showing regarding the exclusion of a juror of a cognizable racial group, that the district court should have required that the government make a showing as to why. An explanation. So the parties have agreed that if we determine that the district court erred in requiring a pattern. Correct. Before proceeding further, that the case should be remanded. Correct. It's in a footnote in the government's brief. It should be remanded for the court to require the government to give a reason. Correct. The crux of this appeal, though, is on Mr. Felix's motion for new trial. And the entirety of this case, I submit, falls upon excerpts of Record 1742. And that's where we discerned in that post-conviction, post-sentencing, that the trial attorneys in this case asked a third prosecutor from the U.S. Attorney's Office to meet with the person who the government was intending to rely on to make its case against Mr. Felix, to have a secret meeting with this witness, Shannon Healy, and to talk with her in the presence of two other federal agents, and not only to advise her of what the ramifications are of giving false testimony, which we have no problem with. Prosecutors can do that. But this third prosecutor did much more. Shannon Healy had given three separate statements about who had shot Mr. Felix. Initially, she had said that Mr. Felix shot himself. She then, prior to trial, said that she had shot Mr. Felix. And then, during trial, she had said that a third person, Tank, had shot Mr. Felix, and she was afraid to come forward with that information because of threats she had received from him. This third prosecutor told Shannon Healy two of those statements, that she had shot Mr. Felix and that Tank had shot Mr. Felix, that he knew that neither of those statements were true, and that by saying those statements, she had already committed a 1001 violation. So, counsel, is that the reason why you think that there was error because of that statement by the prosecutor, that those statements were untrue? I think, under U.S. v. Vavages, that that prosecutor made a huge cross over the permissible line and that those statements to her not only told her what to say, which is a problem, but when the trial prosecutors who were advising the district court judge of the scope of Healy's immunity at trial, I think the district court judge was trying to do his best in understanding the scope of the immunity that she had. So, when the district court judge was listening to the trial prosecutors who told him that she can only be prosecuted if she tells a lie at trial, that was untrue. Why was that untrue? Because the third prosecutor specifically told Healy, you can be prosecuted for this 1001. You've already committed that offense. So, this third prosecutor... Why is that inconsistent with the statement that she could only be prosecuted if she lied? Because the only correct answer for her to say in court was, I shot Felix. If that wasn't true, that's a lie in court. Right. And why is that inconsistent with what... Because if that's a lie in court, that's perjury. Right. But if the, okay, if the judge was told that she was advised that she could not lie in court, I guess there's a disconnect with me regarding that statement and the misconduct that you're saying. Sure. If it is not true that she shot Felix, and that's the only statement that the government is going to accept... Are you saying that the extent of the government's immunity was for that statement only? Correct. Okay. And if that wasn't true, and she's trying to be... She's trying to do what's correct. Well, she told a lot of different stories. She absolutely did. But she's getting inconsistent information. So, when she says, I can't testify because there's no way out. All the government needed to do was... Well, the way out was to tell the truth, right? But there was no way for her to tell the truth. If I tell the truth... There was no way for her to tell the truth, in your view, and keep her immunity. There was no way for her to tell anything. No matter what story she told, it was going to be prosecuted. Because the government didn't believe it was these two stories, and the government wasn't going to accept anything other than that it was Mr. Felix. So, no matter what happened, she was cornered. And that's a problem. And when the government did not tell the defense or the district court about this secret meeting, that's misconduct. And it drove Ms. Healy from the stand. It really didn't matter at that point to Mr. Felix what her testimony was. Because if she would have been charged, it's more than impeachment at that point, because if she would have been charged with perjury, that opens up a whole other line of misconduct that Mr. Felix could have gone after, which demonstrates the pure weakness of the government's case. This was a snowball that didn't need to happen, and it's uncomfortable to talk about this type of misconduct. Everyone knew Ms. Healy was going to have counsel. This makes it an even stronger case than Vavage's. In Vavage's, the prosecutor communicated the threat to the witness through the witness's counsel. It wasn't even directly to the witness. Here we have an unprotected witness flanked by ATF officers and the counsel. I think it's an even clearer-cut case. This needs to go back. I'd also like to talk about the Brady violations in this case, because it kind of intercedes. I think it kind of crosses over with this. One of the things that the district court talks about is the defense was trying to keep Healy out, and then we were complaining because she came in. We were trying to keep Healy out because of the Brady violations. The government kept information from the defense about the benefits that she received. So, yes, because of the undisclosed, untimely Brady information, we tried to keep her out. Counsel, the difficulty I'm having with the Brady argument is, didn't the district court offer a continuance in order for the defense to have the opportunity to look over that evidence? It did. It did. And trial counsel explained the reasons why a continuance would not help. But I thought the government, and I thought the district court waylaid those concerns by saying, I think there was some concern that a witness who was unavailable could be made available if there were continuance. And the government and the court said, well, I won't let that witness testify. It did. Mr. Felix was shot in the leg and had extreme difficulty because he was detained, getting the medical help that he needed in prison. Further detention was not helping him. So in terms of the Brady violation, I think the argument is weakened a little by the fact that the court was making efforts to mitigate. I appreciate that. I appreciate that. And that's always the government's response, is that they should, it's almost rewarding the government for delaying. What I'm saying is, when you have the government saying, I was waiting to the last minute to protect the officer, it shouldn't fly, Your Honor. I know, but looking at it from the judge's point of view, the judge is trying to assuage any prejudice and not condoning the behavior, but figuring out under the law what is the appropriate way to proceed now that we are in this position. I understand. So it's difficult to say that the district court judge erred by trying to mitigate the effect of the violation, because the complaint was we didn't get it in time. Correct. And my larger point, and I do understand, my larger point is, yes, we were trying to keep her out. But once she was in, we had to deal with her as if she was going to be in. So it's not as if we got the relief we wanted. Once she was in, we had every right to try and deal with her as she was in. It's not a matter of we got the relief we wanted. The fact that she was excluded and we could not cross-examine her, that misconduct through the third attorney doesn't satiate anything. We should have had an opportunity to cross-examine her. Without her, there was no connection that would have led to the officers saying we relied on her information to connect the gun from that house to Mr. Felix. She was the nexus that connected the gun. We should have had an opportunity to cross-examine that. And because of the way things played out, we were stripped of it. Yet the government got an opportunity to use her in every way that it wanted to. Yes, her testimony was struck, but they opened with her and they closed with her and they used her, said it was her on the 911 call, and we had nothing. Excuse me, can I ask you something about that 911 call? Yes, Your Honor. Healy made the call, according to the record? According to the record, we don't know who made the call. The government asserted it was Healy who made the call. Was there more than one person on that call? There was, Your Honor. There's unidentified voices. Okay. There's one person that makes a statement to the effect that it was Felix, that Felix had shot himself? That's what it states on the call. His question was, did more than one person make that statement on the 911 call? It's one person, a female voice says, using a nickname for Mr. Felix, says he shot himself, and then another man asks what happened, and another someone advises him what happened, and he says. . . He shot himself? Correct. And was that voice from the record, as you can tell, the same voice that said it the first time? I'd be guessing. I can't tell, but there was no person who testified, that's my voice, but we were never. . . And so when that 911 call was played, it was with the anticipation we were going to be able to have that explained. That's why it all goes back to Healy. Yeah. All right, counsel, you have 35 seconds. We'll give you a minute for rebuttal. Thank you, Your Honor. Thank you. We'll hear from the government. Thank you. May it please the Court, I'm Demetra Lambros for the United States. Were you involved in this case at the trial level? I was not. Okay. I was not. I'm an appellate attorney. All right. On the new trial claim, the district court found that the government did not intimidate or coerce Healy off the stand. It very specifically found that the government did not threaten her with a 1001-violation prosecution unless she testified the way the government wanted. The district court found that the government did not try to prevent her testimony, that it gave her immunity and did everything it could to get her to testify. And the court also found that there was no Brady or Giglio violation in terms of the disclosure of the meeting because it found, had the meeting been disclosed, it just wouldn't have mattered. But let me ask you something, counsel. What do you think, is it unusual for an attorney who's not the trial attorney to meet with the witness? I don't know whether it was unusual in this as a general rule, but in this situation, the trial witnesses, the trial lawyers were in court, and Healy showed up the second day of trial. We had just learned that day that she was going to change her story yet again. So it was kind of an all-hands-on-deck day. We had to turn over that statement. And then what happened also is the district court found the third prosecutor did give pretty strong admonitions against perjury because she had given three different versions of events. But not only did he give admonitions against perjury, but told her she had already committed perjury. Is that unusual? He said that she had already committed a 101 violation. A false statement to the government. Right. A false statement to the government. She had said, she had said that at first she had said two years ago that Felix had shot himself. Then she changed her story two years later when, you know, and said at first, well, I shot him. Then she recanted. And then she comes into trial on the second day and says now another story. Tank shot him. So what was the purpose of telling her that she had already committed a crime? Well, in fact, and this may, there may have been a little bit of a disconnect between the trial attorneys here and the third, the third prosecutor, because that same year, in 2014, the solicitor general had decided that in order to prove a violation of 1001, we had to show that it was a willful violation. That in making a false statement, the defendant knew that it was, that he was breaking the law. Nevertheless, she was told that she had already violated 18 U.S. Code section 1001. She had been told that, yes. So we're looking at this not from the point of view of the solicitor general and how that affected the attorneys, but how that statement affected her. That's right. And she had told, she was told that, that she was told that. But here's the thing. She was told what? She was told that she had already committed a 1001 violation. What do you think, what effect do you think that had on her as a potential witness and somebody who's seeking immunity? I think, well, she's telling three different stories. She was told an obvious thing. She was lying to a Federal, to a Federal agent. That's a statement of fact. Not, one of her stories couldn't be true. What was the point of telling her that she was lying? If you've already given her the admonition that perjury can be prosecuted, what's the point of telling her you've already committed a Federal offense? What was the point of a third attorney who's not the trial attorney giving her that statement? It really was to actually tell her that it's against the law to commit a 1001 violation, because that is what we had to prove. That's what the trial attorneys knew. They knew that guidance. They knew that the only way that we were going to ever be able to prosecute her for 1001 is if she had been warned about it, that those were violations. That's what the ---- But if it's already been committed, then you don't have to warn her, because she's already committed the crime. So what's the point of telling her she's committed the crime if you already know that she's committed the crime? It was a, I would agree with you, it is an ungraceful way of informing her that it's a violation of the law to commit, to give false statements to the government. You put yourself in the place of a witness who's depending on this same office to give her immunity. That statement looks pretty coercive. Except, again, on the question of immunity, she had, she was given full statutory immunity, use and derivative use immunity. And that fully protected her Fifth Amendment right. Her only right under the Fifth Amendment was to not have anything that she said on the stand used against her, including to prove that her prior statement was false.  And the court explained that to her. She had a lawyer. We explained that to her. Nothing she said. But didn't her lawyer advise her? Advise her to take the Fifth Amendment? We think that the lawyer was ill-advising her at that point. Because here's the thing. It seems the Fifth Amendment does not entitle to her to transactional immunity. She doesn't have the right to be immunized for crimes that she may have committed, for false statements she may have committed before she took the stand. That appears to be what Felix has been arguing, is that we, that she deserved transactional immunity, that her Fifth Amendment right was to be somehow immunized for statements that she made beforehand. There isn't such a right. Castigar makes that quite clear. The facts of this case trouble me, I have to tell you. Beginning from the fact that Healy was supposed to be arrested, and instead of being told the police officers where they could find the gun. There are just so many unusual occurrences on the part of the authorities in this case that I'm a little bit disinclined to believe the sequence of events went the way the government says. Oh, I don't know that there's a whole dispute about the sequence of events. Well, the import of the actions of the government, maybe I should say. Because this whole thing with Healy was really, to me, unorthodox in the way ultimately the evidence was obtained. And the defense has a point that she did give a lot of information in the trial, even though her testimony was stricken, the government still relied a lot on the 911 call and the fact that she led them to the gun, right? Well, the 911 call, as the district court found, would have come in regardless of whether Healy took the stand. That call came in as a non-testimonial exclamation. So you didn't need to have Healy, you didn't even have to identify Healy as having been the maker of the 911 call. Felix's girlfriend at the time did indeed say that he saw her, she saw Healy on the phone. But the 911 call comes in quite independently. Right, but if Healy had testified, then the content of the 911 call and who said what could have been tested a little bit more. Well, and we wanted her to testify. That's why we immunized her. And that's why we told her and why the district court kept telling her, you need to testify about this. So we wanted her to testify. She was our star witness at the beginning because she was going to be the person who was going to testify, as she had made many statements before, that he shot himself. So, and to do that. Well, but you don't know if she was going to testify to that at the end. Maybe she was the star witness at the beginning, but at the end, the government wasn't sure what she was going to testify to. Correct. But even so, even though she had made three different, given three different versions of events at that point, we still wanted her to testify. And that's what the district court found about that meeting. It found that, and it didn't actually decide whether we needed to disclose the content of that meeting, what happened. The district court recognized, it assumed that maybe there would be some disclosure, looking at it in the worst possible light, that Healy was somehow strong-armed. But the district court went straight to prejudice, and it found that even had that meeting been disclosed about what happened there, that it would not have made a difference. It went right to prejudice. And what it did in doing that is it went through all different versions of events about how things could have gone down, whether Healy testified, whether she didn't testify, whether or not how she testified. It went through all the different permutations, and it found it wouldn't have mattered. The 911 call would have come in no matter what. Had Healy decided not to take the stand, she didn't, the meeting wouldn't have come in. If she had testified that, in fact, Felix had shot himself, that meeting, that whatever the evidence about that meeting would have come in as some kind of impeachment to show that the government was trying to coerce her in the worst possible light into testifying a certain way. The district court looked at that and said, you know what, it wouldn't have mattered because if she had testified that Felix had shot himself, we would have had the 911 call. We would have had all of her three prior statements to show that Felix had shot himself. So that evidence of that meeting wouldn't have mattered. Ginsburg. Counsel, let me ask you, what was the evidence in the record of possession of the weapon by Mr. Felix? It is the testimony that he shot himself, that he had, and there was no problem with this. Everyone at the trial, and there was an instruction that he knowingly possessed the gun. So the 911 call, he shot himself, gets us where we need to be. Okay. So the government is saying that the 911 call evidence, regardless of who said it, that he shot himself. Yes. Did it identify Felix as having shot himself? Yes. What you hear on that call is the, someone calls up the operator in a panic, and you can hear a woman's voice saying, Scooby, Scooby, Scooby, and we know that that is his nickname. You hear groaning in the background, so she's right there with him, and then she's screaming for an ambulance. The operator asks, you know, where are you? She doesn't know. So she turns to someone in the room and is yelling, what's the address? At some point we hear a voice saying, well, what happened? She continues to yell, he shot himself. Now, and that's that piece. The man comes on, he is also right there. I disagree with Felix here who's saying that he was simply advised. We don't know that. He is, in fact, on the scene, too. He says, I'm here with them. He is also saying that Felix has shot himself in the leg. He's looking at him, and he's saying he's not looking well. So both of these witnesses are right there saying, seeing what the ---- That's the evidence that the government is relying on, the 911 call. Is there anything else other than the 911 call that the government ---- There also is the physical evidence, the physical evidence of the trajectory of the shot. Pardon me? No, I'm sorry. I'm speaking out loud. Sorry. What we also have is the trajectory of the shot. Although no officer testified that the wound was self-inflicted, but the officer was allowed to testify about how the shot, the trajectory. He was shot through his inner left thigh, out his lower left calf. And another witness testified that Felix was right-handed. So the jury was allowed to put two and two together to show that a shot at that angle, going in that way from a right-handed person, was a self-inflicted wound. So there is that. We also had to, of course, connect him to the gun, which we also did. But to get back to your concerns, Your Honor, about the Brady and Giglio, the thing with Healy at the beginning with the Las Vegas police, yes, what happened was she was picked up and she was told, she was asked to point around where the gun might be. And the two officers were told that she should be taken to jail. They disobeyed that order. Instead, and they were honest about it, they traded that information. She wasn't going to go to jail so that they could find out where the gun was. Now, that all came out at the trial. That all came out. And that's not, I mean, the officers were reprimanded, but we needed to find the gun. The gun, by the time the officers got onto the scene, there was no gun. It had been moved. We needed to try to find the gun. So that's why that happened. Counsel, may I ask you to briefly address the Batson issue? Yes. So would you agree that the district court judge required there to be a pattern shown before you got moved to the second step? No. I do not believe that that's what the district court did, and nor do we believe, nor are we saying that this is obviously a remand question at all. The district court did not rule that there had to be a pattern in order to show a prima facie case. In fact, he found there wasn't a pattern because there was another African-American who was seated, but it specifically said that that wasn't the only consideration. And the defense counsel kept pressing to say, look beyond the question. But is it a consideration at the first step, the pattern? It is. It can be a consideration, but it is not. The government, the defense does not have to prove a pattern in order to prove  I thought the Court said there is no pattern. It did say there is no pattern, but that's one of the considerations. He said that is one consideration. There is no pattern. But he then said, but I'm going to keep going. I'm going to keep looking. And the defense counsel kept trying to push him and saying, you know, don't look beyond pattern. We don't have to prove a pattern. And the district court said, I am, I am looking beyond pattern. Okay. So if the very first juror is in the defense's mind being challenged for a reason that is impermissible, and the judge says there is no pattern here, what would, what would be the, even if the pattern is a criteria, why would the judge mention pattern if it's the very first juror? Well, there wouldn't be a pattern with one juror. Right. But that's not what happened here. Because every single juror is entitled to be assessed without reference to any impermissible reason. Correct. Correct. So just striking one juror, if the reason is impermissible, as this Court has found, is impermissible. But that's not what happened here. And the whole question of pattern was, it is one way of showing a prima facie case. If the defense comes forward with some evidence of a pattern, that is a way of showing a prima facie case. Here, that wasn't the only, that wasn't, the district court didn't rely on the lack of a pattern. I mean, it did find that there was no pattern, and because there was one African-American seated, and that does weigh in favor against the inference of discrimination. On ER 14, the district court said, having come from the State of Kentucky where BATS originated out of, you actually have to show a pattern. And they haven't done that. That was the trial lawyer saying that. That's not the government. Oh, that was the trial lawyer saying that. Correct. That's the trial lawyer. Okay. If you look at the prosecutor. No, that was the prosecutor. That was the prosecutor. That was the prosecutor saying that. That was the prosecutor saying that. So why would the prosecutor say that? She was mistaken. She was mistaken on that. I mean, from under this Court's law, she was mistaken, but the defense was very quick on it. The defense said, you do not have to show a pattern, there's no necessary for pattern, and the court is okay. I understand. The court also said, you know, the BATS and criteria looks at pattern is one of five factors. The fact that we have another method, so that factor doesn't satisfy. But then the court. It seemed, to me, it seemed like the judge was picking up on what the prosecutor had said in terms of there having to be a pattern. I think, in fact, the defense counsel won this. That, in fact, if you look at O016, she is saying, you know, there are other criteria, judge. I want you to look beyond pattern. I want you to look beyond pattern. And the court says, I am. I am. So the court did not make a legal mistake here. Yes. Do you think that the prosecutor was saying one thing, but the defense counsel won the day. She was very much focusing the judge on something other than pattern. So I don't think here that the district court made a legal error. It seemed to me that the conversation focused more on pattern than not. Because the court said if there were two, if there were two African-Americans establishing a pattern, it would be impossible. If they strike both, that's a pattern. That's what the court said. So to me, it kind of seemed like the court was really focusing on whether or not a pattern had been shown, when it would have just been easier to proceed to the second step, to ask what the reason was in this case. Well, and in fact, two things. The prosecutor did at that point in the game, because there was this talk about pattern, and the prosecutor did say, I can proffer my reason on the record. And the court did say, no, you don't need to do that. But I'd also like to make the point that this court can itself do the comparative juror analysis and see, even if the district court itself didn't articulate it, and find that there was no clear error here in finding that there was no prima facie case, and seeing that the structure was dissimilar to any of the other seated jurors. Was it unemployment that was the? Yes. Yes. Unemployment. So you're saying there were no other unemployed? The others on the panel who announced and said to the court that they said that they were not employed, those were not seated. Now, there was the one juror, number 17, who was different. When asked about his occupation, he said, my occupation now is retired carpenter. That indicated to the government that that was his profession, that he had been working all of his life. Juror number 19 said, my occupation right now is unemployed. So that is a race-neutral distinguishing feature that this court can. So you're making a distinction between retired and unemployed? In this particular case, the way the record doesn't, isn't, this all happens very fast, but the carpenter got up and said, my occupation is retired carpenter. That indicated that he had been working, that was his profession. He had been working his whole life. And whereas the juror number 19, her occupation, she said, is unemployed, the types of jobs I've done are civil service. Those look like two different kinds of people. Those are race-neutral. All right. Judge Torreira, you have any questions of the government? Not really. All right. Thank you, counsel. Thank you. Rebuttal, one minute. Thank you. I'd like to correct the government's representations regarding the Batson issues. Government counsel is stating things that just aren't in the record. There is no representations regarding what the government counsel's thoughts were and what it meant. Juror 19 said, my occupation right now is unemployed, and she had a civil service background. There is no representations about what it meant to be a retired carpenter and what that meant. So I'd like to just put that on the record. I don't think the government wanted Healy to testify. I think they just wanted to put it out there so they could tie in some gaps. Because if the government at that point wanted to actually have Healy testify, there was problems. And now if we go back, there's going to be problems with that 911 call if Healy doesn't testify. Because now there's Crawford issues. Because although 911 calls can come in, if Healy doesn't testify, we're going to have to have a big discussion about what gets redacted out. So I think that the government overstepped. I think, Judge Rawlinson, you're exactly right. This is an odd situation to have a third prosecutor step in and give these advisements and say you already broke the law, you're in trouble. And I think the only way that this can be remedied in this case is to grant Mr. Felix a brand-new trial, and I'd ask the court that this court please do that. Thank you. All right. Thank you, counsel. Thank you to both counsel for your helpful arguments. This case is submitted for decision by the court. The next case on calendar for argument is Navarro v. Sessions.
judges: Torruella, Schroeder, Rawlinson